**Cynthia BLOCH and Thomas Bloch, Plaintiffs–Appellants,**

v.

**Sheriff L. John RIBAR, Defendant–Appellee.**

**No. 97–3451.**

United States Court of Appeals, Sixth Circuit.

Argued April 22, 1998.

Decided Sept. 21, 1998.

---

Richard J. Marco, Sr. (briefed), Steve C. Bailey (argued), Marco, Marco & Bailey, Medina, OH, for Plaintiffs–Appellants.

Mark D. Landes (argued and briefed), Terri B. Gregori (briefed), Isaac, Brant, Ledman & Teetor, Columbus, OH, for Defendant–Appellee.

Before: GUY, GILMAN, and GODBOLD,* Circuit Judges.

## OPINION

GILMAN, Circuit Judge.

Cynthia Bloch and her husband, Thomas Bloch, brought this action against Sheriff L. John Ribar pursuant to 42 U.S.C. § 1983, claiming that he violated their constitutional rights by holding a press conference to release the confidential and highly personal details of Ms. Bloch's rape by an unknown assailant. They claim that Ribar took this action in retaliation for the Blochs publically criticizing the sheriff's lack of diligence in investigating the crime.

The district court granted Ribar's motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, finding that he was entitled to qualified immunity on both the retaliation claim and the privacy claim as asserted by the Blochs. For the reasons set forth below, we REVERSE the dismissal of the Blochs' retaliation claim, AFFIRM the dismissal of their privacy claim, and REMAND the case for further proceedings consistent with this opinion.

## I. BACKGROUND

Cynthia Bloch was raped by an unknown assailant in Medina County, Ohio on December 29, 1992. She promptly reported the rape to the Medina County Sheriff's Department and gave a detailed statement to the authorities. After the passage of 18 months with no apparent progress in the investiga-

tion, the Blochs agreed to be interviewed by the *Cleveland Plain Dealer.* On July 10, 1994, the newspaper published an article concerning the case, followed by further articles in the *Akron Beacon Journal* in April and May of 1995. All of these articles were critical of the Medina County Sheriff's Department and of Sheriff Ribar personally.

In response to these articles, Ribar convened a press conference on May 3, 1995 to announce that he was requesting that a grand jury investigate Ms. Bloch's rape claim. During the same press conference, Ribar is alleged to have released "highly personal and extremely humiliating details" of the rape suffered by Ms. Bloch. She claims that Ribar's statements to the press "contained details of the acts perpetrated against her that were so embarrassing she had not even told her husband. Most importantly, the release of these humiliating details was unnecessary, illegal according to the prosecutor, and did absolutely nothing to advance the sheriff's defense." The Blochs aver, moreover, that there was no nexus between the details of the rape released by Ribar and the Blochs' criticism of the investigation. The Blochs contend that as a result of Ribar's actions, they have suffered humiliation, embarrassment, and severe mental distress.

Prior to bringing this action, the Blochs attempted to obtain a copy of Ms. Bloch's statement to the sheriff discussing the details of the rape. Relying on the advice of the local prosecutor, the sheriff refused to give them a copy of the statement, claiming that the statement contained non-public information which was exempt from Ohio's Public Records Law.

The Blochs then brought a claim under 42 U.S.C. § 1983 in federal court, alleging that Ribar both retaliated against them for exercising their first amendment right to criticize public officials and violated their right to privacy by publically revealing confidential and extremely embarrassing personal information. Ribar responded by filing a motion

---

* The Honorable John C. Godbold, Circuit Judge of the United States Court of Appeals for the Eleventh Circuit, sitting by designation.

to dismiss pursuant to Rule 12(b)(6). (Ribar died after the filing of his motion, as set forth in a Suggestion of Death appropriately filed in the record, but we will continue to refer to Ribar as the defendant for the purpose of this opinion.)

Adopting the magistrate judge's Report and Recommendation, the district court granted Ribar's motion to dismiss both the retaliation claim and the privacy claim on the basis of qualified immunity. As to the retaliation claim, the district court held that "there is no 'clearly established' right to exercise one's First Amendment rights without fear of embarrassing information being revealed in response by a public official exercising his/her First Amendment rights as well." Addressing the Blochs' privacy claim, the district court held that "there is no 'clearly established' constitutional protection regarding the disclosure of private information in general, notwithstanding that such disclosure may be humiliating and/or embarrassing."

On appeal, the Blochs claim that the district court erred by granting qualified immunity to Ribar. They argue that the right to criticize a public official is a clearly established right under the First Amendment. Although they acknowledge that Ribar had a right to defend himself against criticism, they contend that the sensitive information regarding the rape fell outside the scope of his potential defense. In addition, the Blochs allege that Ribar's statements to the press about the sensitive details of the rape were in retaliation for the exercise of their first amendment right to criticize public officials. They support this claim in part with the assertion that "a detective of the sheriff's department visited Mrs. Bloch shortly before the story was published and asked her if she had been talking to the news media. He warned her that she should be careful what she said to the papers because she could be used for 'political purposes.'" The Blochs contend that they have suffered injury as a result of this retaliation.

The Blochs further argue that the district court failed to employ the appropriate test in evaluating their constitutional privacy claim. They assert that the district court should have balanced the Blochs' privacy interests against any public benefit to be gained from disseminating the information. Again they contend that they have suffered injury as a result of this infringement on their privacy.

## II. STANDARD OF REVIEW

We review a district court's decision to dismiss a suit pursuant to Rule 12(b)(6) *de novo*. *See Sistrunk v. City of Strongsville*, 99 F.3d 194, 197 (6th Cir.1996). Rule 12(b)(6) provides that a complaint may be dismissed for failure to state a claim upon which relief can be granted. The court must construe the complaint in a light most favorable to the plaintiff, and accept all of her factual allegations as true. *See id.* at 197. When an allegation is capable of more than one inference, it must be construed in the plaintiff's favor. *See Columbia Natural Resources, Inc. v. Tatum*, 58 F.3d 1101, 1109 (6th Cir.1995). Dismissal pursuant to a Rule 12(b)(6) motion is proper "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

In addition, we review a district court's finding of qualified immunity *de novo*. *See O'Brien v. City of Grand Rapids*, 23 F.3d 990, 998 (6th Cir.1994). When the defense of qualified immunity is asserted, the complaint must "include the specific, nonconclusory allegations of fact that will enable the district court to determine that those facts, if proved, will overcome the defense of qualified immunity." *Veney v. Hogan*, 70 F.3d 917, 922 (6th Cir.1995).

## III. ANALYSIS

To successfully establish a prima facie case under 42 U.S.C. § 1983, a plaintiff must prove the following two elements: (1) the defendant must be acting under the color of state law, and (2) the offending conduct must deprive the plaintiff of rights secured by federal law. *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). Because Ribar was acting in his official capacity as the sheriff of Medina County at all times relevant to this lawsuit, it is indisputa-

ble that he was acting under the color of state law. As for the second element, the Blochs allege that their constitutional rights were violated when Ribar issued a press release discussing the sensitive details of the rape both in retaliation for the exercise of their first amendment right to criticize public officials and in violation of their right to privacy.

■ Ribar argues that he is entitled to qualified immunity on both claims. The Supreme Court has held that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Accordingly, the first step in any qualified immunity analysis is to determine whether a clearly established statutory or constitutional right has been violated. *Barrett v. Harrington,* 130 F.3d 246, 262 (6th Cir.1997). If a constitutional right has been violated, we must then consider whether the public official acted "objectively unreasonable in light of [the] clearly established constitutional right[ ]." *Adams v. Metiva,* 31 F.3d 375, 387 (6th Cir.1994); *see Dickerson v. McClellan,* 101 F.3d 1151, 1158 (6th Cir.1996) (holding that "for a plaintiff to make a successful § 1983 claim, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.' " (quoting *Russo v. City of Cincinnati,* 953 F.2d 1036, 1042 (6th Cir.1992))).

## A. The Retaliation Claim

### 1. *Constitutional Right Against Retaliation*

Without specifically considering the merits of the Blochs' retaliation claim, the district court concluded that "there is no 'clearly established' right to exercise one's First Amendment rights without fear of embarrassing information being revealed in response by a public official exercising his/her First Amendment rights as well." Pursuant to the Rule 12(b)(6) standard discussed above, the district court necessarily conclud-

ed that "no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

■ Before we can consider whether Ribar is entitled to qualified immunity for his statements to the media, we must first examine whether the Blochs have properly alleged a cause of action. In order to prove a claim for retaliation, a plaintiff must establish the following elements: (1) that the plaintiff was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused the plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights. *See generally Mt. Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Barrett v. Harrington,* 130 F.3d 246 (6th Cir.1997); *Ratliff v. Wellington Exempted Village Schools Bd. of Educ.,* 820 F.2d 792 (6th Cir.1987); *Bart v. Telford,* 677 F.2d 622 (7th Cir.1982).

### a. *Right to Criticize Public Officials*

■ In the instant case, we begin our analysis by considering whether the underlying action taken by the Blochs was a constitutionally protected activity. Of this there can be no doubt. The First Amendment clearly protects the Blochs' right to criticize Ribar in his role as a public official. *See Glasson v. City of Louisville,* 518 F.2d 899, 904 (6th Cir.1975) ("The right of an American citizen to criticize public officials and policies and to advocate peacefully ideas for change is 'the central meaning of the First Amendment.' " (quoting *New York Times v. Sullivan,* 376 U.S. 254, 273, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964))).

### b. *Existence of an Adverse Action*

■ Next we must consider whether the Blochs have articulated a claim that, if proven, could satisfy the second element of the retaliation analysis, i.e., whether Ribar's ad-

verse action caused them to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that constitutionally protected activity.

As an initial matter, Ribar argues that the injury alleged in a retaliation case must be more than a claim of simple embarrassment or humiliation. He contends that the Blochs must allege a "specific, visible injury or harm." Ribar claims in his brief that he "has been unable to locate a single case recognizing a First Amendment retaliation claim where the injury alleged was solely embarrassment, humiliation and/or emotional distress."

Apparently Ribar did not search very far. Notwithstanding Ribar's sweeping statement, the Supreme Court has held that, in the context of a § 1983 action, "compensatory damages may include ... such injuries as 'impairment of reputation ..., personal humiliation, and mental anguish and suffering.'" *Memphis Community School Dist. v. Stachura,* 477 U.S. 299, 307, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986) (quoting *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 350, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974)). This court has also recognized these types of injuries. *See Barrett v. Harrington,* 130 F.3d 246 (6th Cir.1997) (affirming a denial of summary judgment on qualified immunity grounds when a judge retaliated against a litigant by attempting to embarrass him); *Chatman v. Slagle,* 107 F.3d 380, 384–85 (6th Cir.1997) (listing numerous cases that have found emotional distress to be a compensable injury under § 1983, including damages for "intimidation, marital problems, weight loss, loss of sleep, shock, or humiliation." (quoting *Holmes v. Donovan,* 984 F.2d 732, 739 (6th Cir.1993))); *Pembaur v. City of Cincinnati,* 882 F.2d 1101, 1104 (6th Cir.1989) ("[T]he injury need not have been a physical one. Damages for pain and suffering, mental anguish, and the like are available to the extent that actual injury has been proved.").

Other circuits have reached a similar conclusion. In *Bart v. Telford,* 677 F.2d 622 (7th Cir.1982), for example, a city employee in the mayor's office ran in an election against the incumbent mayor. Upon the employee's return to the mayor's office after losing the election, her co-workers, including the mayor, began harassing her. She consequently brought a retaliation claim under § 1983. The employee alleged, among other things, that she was harassed for bringing a birthday cake to work on a co-worker's birthday, even though the office generally encouraged this type of behavior. While noting that many of the employee's claims of harassment seemed trivial, the Seventh Circuit observed that "[t]he effect on freedom of speech may be small, but since there is no justification for harassing people for exercising their constitutional rights it need not be great in order to be actionable." *Id.* at 625.

The Seventh Circuit recognized, however, that a constitutional tort "to be actionable requires injury." *Id.* It added that "[i]t would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise." *Id.* Finally, the court determined that "[i]t is a question of fact whether the campaign [of petty harassments] reached the threshold of actionability under section 1983." *Id.* The court then remanded the case for further proceedings. *Id.* at 626.

■ For additional authorities on the issue of compensable injury, *see, e.g., Bernheim v. Litt,* 79 F.3d 318, 326 (2d Cir.1996) (holding that in a claim for retaliation, the "plaintiff's claim of 'great worry and unhappiness' could reasonably be read as a claim for emotional distress, a legally recognized and compensable harm."); *Coleman v. Kaye,* 87 F.3d 1491, 1507 (3d Cir.1996) (rejecting the defendant's "argument that [plaintiff] did not suffer an 'actual injury' because a reasonable jury could credit [plaintiff's] testimony as to the personal anguish she suffered" as a result of the adverse action taken by the defendant); *Maldonado Santiago v. Velazquez Garcia,* 821 F.2d 822, 829 (1st Cir.1987) ("It is well established that damages are recoverable under 42 U.S.C. section 1983 for emotional distress caused by due process deprivations."). Based on the above authorities, we conclude that the Blochs' allegation of injury based on embarrassment, humiliation, and emotional

distress is sufficient to be actionable under § 1983.

The district court, however, did not rule on Ribar's argument concerning the type of injury required in a retaliation action. Instead, it quoted *Samad v. Jenkins*, 845 F.2d 660, 663 (6th Cir.1988), for the proposition that "a mere 'subjective chilling' of first amendment rights by virtue of a possible misuse of the collected information did not create a federally justiciable controversy." The district court then concluded that "there is no 'clearly established' right to exercise one's First Amendment rights without fear of embarrassing information being revealed in response by a public official exercising his/her First Amendment rights as well."

In *Samad*, this court rejected the claim that a professor's speech was chilled by his university threatening to release a letter detailing the results of an internal investigation that uncovered embarrassing information about the professor. The University of Akron School of Law was preparing to dismiss Samad, a law school professor, for cause. Upon learning of the pending dismissal, Samad negotiated a settlement whereby he would resign from the law school at the end of the summer term, take a paid leave of absence for the following fall term, and then work in a non-teaching capacity for the university for an additional semester. At the end of the summer term, the dean of the law school sent a letter to Samad reminding him of their agreement. Two weeks later, the dean wrote an additional letter noting that the law school retained the file compiled on Samad and, if he violated the terms of the agreement, the information contained in the file would be released.

Samad filed suit, claiming that the second letter " 'tended to compel' Samad not to exercise his rights of free speech under the first amendment, in contravention of § 1983." *Id.* at 663. Relying on *Gordon v. Warren Consolidated Bd. of Educ.*, 706 F.2d 778 (6th Cir.1983), this court concluded that " 'the mere and *proper* use of information' is not itself actionable under the civil rights statutes," and that "such a mere 'subjective chilling' of first amendment rights by virtue of a possible misuse of the collected information

did not create a federally justiciable controversy." *Samad*, 845 F.2d at 663 (emphasis added). The court also noted that "[i]ronically, plaintiff is accusing defendants of chilling his first amendment freedoms by reserving their own first amendment right to speak out." *Id.*

Samad, however, is distinguishable from the instant case on numerous grounds. As an initial matter, Samad was still employed by the university at the time of the action. *See Wright v. Illinois Dep't of Children & Family Servs.*, 40 F.3d 1492, 1500 (7th Cir. 1994) ("Our examination proceeds from the long-recognized premise that the government has a freer hand in regulating the speech of its employees than in regulating the speech of the public at large."). In addition, at the time of Samad's complaint, the law school had not released any of the embarrassing information. The opinion specifically noted that the court would not recognize a claim for a *possible misuse* of information. *Samad*, 845 F.2d at 663. In *Gordon*, the case relied upon in *Samad*, the court stressed that the future possibility of a misuse of information, as opposed to an action alleging that a misuse had already occurred, could not be actionable, as it would be an advisory opinion. *Gordon*, 706 F.2d at 780–81.

Unlike the facts in *Samad*, Ribar actually spoke to the media and allegedly misused confidential information concerning the rape in retaliation for the Blochs' criticism. Thus the Blochs are complaining about a purported misuse that has actually occurred, not a possible future misuse or a subjective chilling. Finally, *Samad* turned in part on the fact that the second letter was consistent with terms of the parties' settlement agreement, so that the use of the information would have been proper in that case.

The present case is much closer to this court's recent decision in *Barrett v. Harrington*, 130 F.3d 246 (6th Cir.1997), than to *Samad*. In *Barrett*, the plaintiff was a disgruntled litigant who published critical statements concerning the behavior of Harrington, a state court judge. In response to this criticism, Harrington issued statements to the press claiming that Barrett had been "stalking, harassing, and otherwise intimidat-

ing her." *Id.* at 262. Harrington wrote a letter on her judicial letterhead to the state district attorney, complaining of Barrett's harassment and commenting that she would have to recuse herself from further judicial proceedings involving Barrett. Harrington also spoke to the news media about Barrett's alleged harassment. In response to Harrington's actions, Barrett brought a retaliation claim under § 1983. Specifically, Barrett asserted that Harrington acted with a "retaliatory motive to publicly humiliate and denigrate" him. *Id.* at 263. Harrington moved for summary judgment on the basis of both absolute immunity and qualified immunity. After the district court denied all of Harrington's motions, she appealed. This court affirmed in part and reversed in part.

With respect to absolute immunity for alerting the district attorney of the alleged harassment, this court held that the district court erred in refusing to grant Harrington's motion for summary judgment. *Id.* at 260. The court then considered Harrington's claim of qualified immunity concerning the statements to the media. After concluding that Barrett's right to criticize a public official was firmly established in a long tradition of constitutional law, this court noted that "[c]riticism of government is at the very center of the constitutionally protected area of free discussion." *Id.* at 262–63 (quoting *Rosenblatt v. Baer*, 383 U.S. 75, 85, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966)). The "[f]reedom to criticize public officials and expose their wrongdoing is at the core of First Amendment values, even if the conduct is motivated by personal pique or resentment." *Id.* at 263.

This court next decided that Barrett's criticism was a " 'substantial' or 'motivating' factor in Judge Harrington's conduct." *Id.* Considering the evidence in the record, there was no indication that Harrington would have accused Barrett of harassment if Barrett had refrained from criticizing her. This led to the possibility that "in speaking to the media, Harrington did have a retaliatory motive to publicly humiliate and denigrate" the litigant. *Id.* In light of these facts, Barrett's retaliation claim properly survived summary judgment.

Similarly, the Blochs have averred that Ribar released confidential and humiliating information that constitutes an adverse action against them. The Blochs contend that while Ribar had the right to respond to their criticism, this right is not unlimited. They specifically argue that Ribar's right to respond to the Blochs' criticism did not include the right to reveal irrelevant, humiliating, and confidential information. They further allege that Ribar's public release of the private details of the rape damaged them by chilling their right to freely criticize a public official.

We agree with the Blochs that Ribar's right to respond to their criticism is not unlimited, and hold that the Blochs have properly alleged that Ribar's adverse action caused them to suffer an injury that would chill people of ordinary firmness from continuing to engage in their constitutionally protected activity. Accordingly, we conclude that the Blochs' allegations satisfy their burden under Rule 12(b)(6) for establishing the second element of the retaliation analysis.

### c. Ribar's Intent

■ Finally, we must consider whether Ribar's action in releasing the information was motivated at least in part as a response to the Blochs' exercise of their first amendment rights. Considering the standard of review on a motion to dismiss pursuant to Rule 12(b)(6), we must determine whether any given set of facts could sustain the retaliation claim as alleged by the Blochs. If the Blochs can offer facts supporting their contention that Ribar released the information with the intent to injure the Blochs for criticizing his performance, they will have met the burden necessary to sustain the complaint at this stage in the litigation. *See Bart v. Telford*, 677 F.2d 622, 625 (7th Cir.1982) (noting that the plaintiff needed only to show "a suggestion [in the complaint] that the subsequent campaign of petty harassments was motivated by [the plaintiff's] views" in order to survive a motion to dismiss under Rule 12(b)(6)).

We start our analysis on this aspect of the retaliation claim from the premise that "[a]n act taken in retaliation for the exercise of a

constitutionally protected right is actionable under § 1983 even if the act, when taken for a different reason, would have been proper." *Matzker v. Herr,* 748 F.2d 1142, 1150 (7th Cir.1984); *see DeLoach v. Bevers,* 922 F.2d 618, 620 (10th Cir.1990) (same quotation). We also note that proof of an official's retaliatory intent rarely will be supported by direct evidence of such intent. *See Mc-Donald v. Hall,* 610 F.2d 16, 18 (1st Cir.1979) (reversing the district court's dismissal of the plaintiff's claim, holding that it will often be difficult to support a claim requiring a showing of the defendant's state of mind with direct evidence in a complaint). Accordingly, "claims involving proof of a [defendant's] intent seldom lend themselves to summary disposition." *See Curtis v. Story,* No. 87–5988, 1988 WL 125361, at *3 (6th Cir. Nov. 25, 1988).

In the present case, the Blochs have alleged facts that, if proven, will support their claim. For example, they have alleged that a deputy sheriff told them to stop criticizing Ribar or risk being used for "political purposes." In addition, Ribar had remained quiet concerning the rape investigation for 18 months, and chose to go public with the humiliating details only after the Blochs' criticism had been published. The Blochs also claim that the information released did not relate to their criticism of his investigation. Finally, it remains unclear how these details would assure concerned local citizens that Ribar was conducting a thorough investigation, the latter being the subject of the Blochs' criticism.

■ After considering the Blochs' allegations in their complaint and the applicable legal precedents, we find that the Blochs have raised a cognizable retaliation claim under § 1983. Dismissal pursuant to Rule 12(b)(6) was therefore inappropriate unless the doctrine of qualified immunity is applicable.

### 2. The Qualified Immunity Defense

■ Having concluded that the Blochs' § 1983 claim for retaliation is viable, we must now consider Ribar's defense of qualified immunity. This court in *Barrett v. Harrington,* 130 F.3d 246 (6th Cir.1997), concluded that

Judge Harrington was not shielded from liability by the doctrine of qualified immunity. Specifically, this court held that "it is evident that the First Amendment right to criticize public officials is well-established and supported by ample case law. Furthermore, it is well-established that a public official's retaliation against an individual exercising his or her First Amendment rights is a violation of § 1983." *Id.* at 264.

While both Harrington and Ribar had the right to respond publically to the criticism lodged against them, neither are permitted to do so with the intent of injuring the complainant and chilling such a person from continuing to exercise his or her constitutional rights. In addition, both Barrett and the Blochs are private citizens, as opposed to government employees such as the professor in *Samad.* Both Barrett and the Blochs, moreover, allegedly suffered similar injuries—humiliation and embarrassment.

Finally, the courts that have considered qualified immunity in the context of a retaliation claim have focused on the retaliatory intent of the defendant. As the Tenth Circuit said in *DeLoach v. Bevers,* 922 F.2d 618, 620 (10th Cir.1990): "The unlawful intent inherent in such a retaliatory action places it beyond the scope of a police officer's qualified immunity if the right retaliated against was clearly established." The Second Circuit also rejected the defense of qualified immunity in a retaliation case, finding that "the proscription of retaliation for a plaintiff's exercise of First Amendment rights has long been established." *Dobosz v. Walsh,* 892 F.2d 1135, 1141–42 (2d Cir.1989). In addition, the Ninth Circuit articulated the principle that "government officials in general, and police officers in particular, may not exercise their authority for personal motives, particularly in response to real or perceived slights to their dignity. Surely, anyone who takes an oath of office knows—or should know—that much." *Duran v. City of Douglas,* 904 F.2d 1372, 1378 (9th Cir.1990). Finally, as discussed above in *Barrett,* this court held that a judge was not immune from a § 1983 claim stemming from the judge's comments made to the media in retaliation for a former litigant's criticism of the judge's ethics. Not

only was the right to criticize public officials held to be a clearly established right, "but Harrington knew or should have known that she may have been violating Barrett's First Amendment rights when she accused him of stalking to reporters." *Barrett,* 130 F.3d at 264.

Accordingly, we conclude that Ribar is not entitled to qualified immunity from the Blochs' retaliation claim because the right to criticize public officials is clearly established, the Blochs have alleged that they suffered embarrassment and humiliation that would chill people of ordinary firmness from continuing to exercise their constitutional rights as a result, and they claim that the release of the highly personal information was motivated at least in part as a response to the exercise of those rights. Ribar clearly had a right to respond to the criticism, but if the Blochs can prove that the intimate details of the rape were released in order to retaliate against their criticism, a reasonable officer should have known that the action violated the Blochs' rights and therefore cannot benefit from the doctrine of qualified immunity. Accordingly, we reverse the district court's dismissal of the Blochs' retaliation claim.

### B. The Privacy Claim

The district court dismissed the Blochs' privacy claim on two grounds. First, the district court held that the Blochs' right-to-privacy allegations were too vague. In light of this conclusion, the court held that "no determination can be made that a reasonable officer would know that such publication would be violative of any constitutionally protected right of Plaintiff." Second, the district court concluded that the Blochs "failed to meet their burden of demonstrating the existence of a 'clearly established' constitutional right." In drawing these conclusions, the district court primarily relied on this court's decisions in *J.P. v. DeSanti,* 653 F.2d 1080 (6th Cir.1981) (holding that the right to privacy was not violated when the state released personal information about juveniles to other governmental, social, and religious agencies), and *Doe v. Wigginton,* 21 F.3d 733 (6th Cir.1994) (holding that an inmate's right to privacy was not violated when prison offi-

cials disclosed his HIV status to corrections officers).

Because the proper order of consideration begins with the determination of whether a violation of a constitutional right occurred, and then proceeds to a consideration of the defense, we will begin our analysis with the former, then discuss Ribar's defense of qualified immunity, and conclude by addressing the district court's vagueness rationale. While we note that a question exists as to whether Mr. Bloch has standing to bring this privacy claim, we find it unnecessary to consider this issue because it was not addressed by the parties and because of our conclusion that Ribar is entitled to qualified immunity on this cause of action. Standing is not an issue on the retaliation claim because Mr. Block joined in the criticism of Ribar and his department.

#### 1. The Constitutional Right to Privacy

The Supreme Court in *Whalen v. Roe,* 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977), identified two legal principles developing out of the constitutional right to privacy that is rooted in the Fourteenth Amendment. The first principle protects an individual's right to make certain personal choices. This principle, for example, underscored the Supreme Court's rationale in *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). The other principle of privacy, and the one at issue in the present case, protects an individual's right to control the nature and extent of information released about that individual. *See Whalen,* 429 U.S. at 599–600, 97 S.Ct. 869; *Nixon v. Adm'r of Gen. Servs.,* 433 U.S. 425, 457, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977) (noting that the right to privacy includes an " 'individual interest in avoiding disclosure of personal matters' " (quoting *Whalen,* 429 U.S. at 599, 97 S.Ct. 869)); *Kallstrom v. City of Columbus,* 136 F.3d 1055 (6th Cir.1998) (holding that undercover police officers, whose personal files had been released to a violent gang which they had infiltrated and were testifying against, possessed a privacy interest in preserving their lives, personal security, and bodily integrity).

This latter principle has been coined an informational right to privacy. Unlike many

other circuits, this court has narrowly construed the holdings of *Whalen* and *Nixon* to extend the right to informational privacy only to interests that implicate a fundamental liberty interest. *J.P. v. DeSanti*, 653 F.2d 1080, 1090 (6th Cir.1981); *see Kallstrom*, 136 F.3d at 1061 ("This circuit has read *Whalen* and *Nixon* narrowly, and will only balance an individual's interest in nondisclosure of informational privacy against the public's interest in and need for the invasion of privacy where the individual privacy interest is of constitutional dimension."). Specifically, *DeSanti* held the right to informational privacy will be triggered only when the interest at stake relates to "those personal rights that can be deemed 'fundamental' or 'implicit in the concept of ordered liberty.'" *DeSanti*, 653 F.2d at 1090.

Accordingly, a constitutional right to nondisclosure of certain types of private information exists, but not all disclosures of private information will trigger constitutional protection. *DeSanti* requires the following two-step process for analyzing informational right-to-privacy claims: (1) the interest at stake must implicate either a fundamental right or one implicit in the concept of ordered liberty; and (2) the government's interest in disseminating the information must be balanced against the individual's interest in keeping the information private. *Id.* at 1090–91.

In *Whalen*, the Supreme Court considered whether a New York statute, requiring that the names of all patients receiving certain drugs be transferred to a state agency, violated the patients' privacy rights. 429 U.S. at 591–93, 97 S.Ct. 869. The Court concluded that the patients possessed a right to privacy in their medical records. The Court then balanced the patients' interest in keeping this information confidential against the government's interest in disclosure. The state had taken many measures designed to limit and control the disclosure of the information. In *Whalen*, the Court specifically reserved the question that is before us in the present case by stating: "We ... do not [ ] decide any question which might be presented by the *unwarranted* disclosure of accumulated private data—whether intentional or

unintentional—or by a system that did not contain comparable security provisions." *Id.* at 605–06, 97 S.Ct. 869 (emphasis added). The Court finally weighed the state's interest in preventing drug abuse against the minimal invasion of the patients' interest in privacy and concluded that the infringement did not violate the Constitution. *Id.* at 598–604, 97 S.Ct. 869.

Our decision in *DeSanti* narrowly construed the holding in *Whalen*. In *DeSanti*, juveniles who had been convicted of a crime challenged the release of personal information to governmental, social, and religious agencies. *DeSanti*, 653 F.2d at 1082. This court rejected their claim, concluding that no general right to privacy exists that protects against the dissemination of personal information. *Id.* at 1090. Furthermore, a balancing test should be employed only if fundamental or traditional rights are implicated. *Id.* at 1090–91. In reaching this conclusion, this court primarily relied on *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). In *Paul v. Davis*, the Supreme Court held that the police's circulation of a flyer discussing the plaintiff's arrest for shoplifting did not violate his right to privacy. The Court determined that no constitutional violation occurred because the state did not "restrict [plaintiff's] freedom of action in a sphere contended to be 'private,'" and the state possessed an interest in "publiciz[ing] a record of an official act such as an arrest." *Id.* at 713, 96 S.Ct. 1155.

Our decision in *DeSanti*, however, leaves room for finding that the dissemination of private information may implicate a constitutional right to privacy. *See Kallstrom v. City of Columbus*, 136 F.3d 1055, 1062 (6th Cir.1998) (holding that undercover police officers, whose personal files had been released to a violent gang which they had infiltrated and were testifying against, possessed a privacy interest "in preserving their lives and the lives of ... their family members, as well as preserving their personal security and bodily integrity."); *In re Zuniga*, 714 F.2d 632, 642 (6th Cir.1983) (holding that psychiatric patients' right to prevent their doctors from revealing their names and the length of their treatment implicated a fundamental

right, but concluding that the state's interest in obtaining the information outweighed the patients' right to prevent its publication, in part because "the information will be disclosed only to the minimal extent necessary to promote a proper governmental interest and will not be subject to widespread dissemination.").

Accordingly, we must first determine whether the rights allegedly violated by Ribar implicate either fundamental rights or rights "implicit in the concept of ordered liberty." *DeSanti,* 653 F.2d at 1090. If so, we must then balance the government's interest in disseminating the information against the Blochs' right to informational privacy. To answer the first question, we must consider the nature of the information released.

### a. Personal Sexual Matters

■ Crimes of sexual violence necessarily include a nonconsensual sexual act. The crime of rape, for example, cannot be separated from the sexual act itself. For this reason, a historic social stigma has attached to victims of sexual violence. In particular, a tradition of "blaming the victim" of sexual violence sets these victims apart from those of other violent crimes. Releasing the intimate details of rape will therefore not only dissect a particularly painful sexual experience, but often will subject a victim to criticism and scrutiny concerning her sexuality and personal choices regarding sex. This interest in protecting the victims of sexual violence from humiliation, among other injuries, has prompted states to pass rape shield laws and to advocate against the publication of rape victims' names. *See* Panel Discussion, *Men, Women and Rape,* 63 Fordham L.Rev. 125 (1994) (discussing "Why Rape is Different" and outlining some of the legal reforms in place and those reforms needed to be implemented); Morrison Torrey, *When Will We Be Believed? Rape Myths and the Idea of a Fair Trial in Rape Prosecutions,* 24 U.C. Davis L.Rev. 1013 (1991) (discussing rape prosecution reforms, including rape shield laws).

Our sexuality and choices about sex, in turn, are interests of an intimate nature which define significant portions of our personhood. Publically revealing information regarding these interests exposes an aspect of our lives that we regard as highly personal and private. Indeed, for many of these reasons, a number of our sister circuits have concluded that information regarding private sexual matters warrants constitutional protection against public dissemination. *See, e.g., Eastwood v. Dep't of Corrections,* 846 F.2d 627, 631 (10th Cir.1988) ("This constitutionally protected right [to privacy] is implicated when an individual is forced to disclose information regarding personal sexual matters."); *Mangels v. Pena,* 789 F.2d 836, 839 (10th Cir.1986) ("Information is constitutionally protected when a legitimate expectation exists that it will remain confidential while in the state's possession.... The legitimacy of an individual's expectations depends, at least in part, upon the intimate or otherwise personal nature of the material which the state possesses." (internal citations omitted)); *Thorne v. City of El Segundo,* 726 F.2d 459, 468 (9th Cir.1983) ("The interest [the plaintiff] raises in the privacy of her sexual activities are within the zone protected by the constitution. This conclusion follows from the cases holding that such basic matters as contraception, abortion, marriage, and family life are protected by the constitution from unwarranted government intrusion."); *United States v. Westinghouse Electric Corp.,* 638 F.2d 570, 577 (3d Cir.1980) ("Information about one's body and state of health is a matter which the individual is ordinarily entitled to retain within the private enclave where he may lead a private life." (internal quotation marks and citations omitted)); *see also* Peter B. Edelman, *Free Press v. Privacy: Haunted by the Ghost of Justice Black,* 68 Tex. L.Rev. 1195, 1208 n.69 (1990) (quoting Professor Anita Allen as stating: "Rape is an act of physical violence which by its very nature is an affront to privacy. It represents forcible exposure of aspects of oneself that are protected by conventions of limited access. These conventions are normally adhered to out of regard for well-being and respect for personal privacy.").

The fact that the crime of rape occurred in this case implicates both a private and a

public interest, but the details of the rape primarily implicate a private interest until such time as the public interest in prosecution predominates. We therefore conclude that a rape victim has a fundamental right of privacy in preventing government officials from gratuitously and unnecessarily releasing the intimate details of the rape where no penalogical purpose is being served.

### b. Balancing the Blochs' Interest Against the State's Interest

Having concluded that the right to prevent the dissemination of confidential and intimate details of a rape implicates a fundamental right, we must now balance the Blochs' privacy interest against the state's interest in releasing the details. "Where state action infringes upon a fundamental right, such action will be upheld under the substantive due process component of the Fourteenth Amendment only where the governmental action furthers a compelling state interest." *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1064 (6th Cir.1998). Based on the allegations in the present case, there appears to have been no justification for disseminating the details of the rape at the time of Ribar's press conference. There was no indication that the release of the details was necessary to apprehend a suspect or for any specific law enforcement purpose.

If the details were released in connection with a trial, for example, the compelling state interest in prosecuting a criminal would almost certainly outweigh the Blochs' privacy interest. Similarly, if certain details of the rape could assist law enforcement personnel in apprehending a suspect, and the release of these details was narrowly tailored to reach that end, then the dissemination of the information might also outweigh the Blochs' privacy interest. No such defense, however, has been raised by Ribar. In fact, Ribar allegedly told the Blochs that they could not have access to Ms. Bloch's statement to the police because it was not a publically available document at that stage of the investigation. It thus seems inconsistent for Ribar to have disclosed the document's contents at a press conference while at the

same time denying the Blochs a copy on the ground that it was not publically available.

Ribar also argues that the Blochs have essentially waived their right to privacy by speaking to the media. The Blochs allege, however, that the information released by Ribar was not included in their statements to the press. They further contend that, absent a compelling state interest, only they should be allowed to publically discuss any of the personal and intimate details of the rape. We agree that the Blochs did not waive any right to prevent the publication of the most sensitive details of the rape as long as those details were omitted from their statements to the press.

We conclude that the Blochs have raised a cognizable privacy claim under § 1983. Having found that facts consistent with the allegations in the complaint could provide relief under § 1983, dismissal pursuant to rule 12(b)(6) was inappropriate unless the doctrine of qualified immunity is applicable. *See* Edelman, *supra*, at 1198 n. 17 (discussing that in the context of a rape investigation, "[h]olding the state to a constitutional duty not to disclose certain private information about one of its citizens would not be altogether surprising under traditionally accepted constitutional analysis.").

### 2. The Qualified Immunity Defense

Despite what appears to be a possible violation of the Blochs' privacy interests in this case, their claim against Ribar on this ground must fail because, as the district court held, a reasonable public official would not be on notice that the release of such intimate details of a rape constituted an actionable violation of a rape victim's privacy interests. A reasonably prudent sheriff should have refrained from unnecessarily releasing the highly confidential and embarrassing personal information, but in light of the dearth of case law on this issue and the complexities stemming from the nature of crimes of sexual violence, it would be unfair to conclude that a reasonable official would have been aware that releasing these details violated a clearly established constitutional right to privacy. *See Daughenbaugh v. City of Tiffin*, 150 F.3d 594 (6th Cir.1998) (holding

that law enforcement officials are entitled to qualified immunity when unsettled interpretations in a particular area of the law make the law unclear).

In sum, we conclude that Ribar's defense of qualified immunity is justified with respect to the Blochs' privacy claim. In light of our ruling in the present case, however, public officials in this circuit will now be on notice that such a privacy right exists. Therefore, any future violation will not allow an official such as Ribar to claim the lack of reasonable notice that is necessary to sustain a defense of qualified immunity.

### 3. The Vagueness Rationale

■ The other ground utilized by the district court for dismissal of the Blochs' privacy claim was based on the rationale that the allegations against Ribar were too vague to constitute a cause of action. This rationale, however, is inconsistent with the standard for dismissal set forth in Rule 12(b)(6). While the district court might have been justified in dismissing the privacy claim on summary judgment in the absence of additional proof, Rule 12(b)(6) requires that the court assume that all the facts alleged in the complaint are true. Thus, at this stage of the litigation, the Blochs are only required to plead with enough specificity to create a foundation for recovery against the defense of qualified immunity. *See Veney v. Hogan*, 70 F.3d 917, 921–22 (6th Cir.1995).

■ The Blochs have done so in this case. They alleged that Ribar released intimate details of Ms. Bloch's rape, that they possess a clearly established constitutional right to prevent the disclosure of these highly intimate details, and that they suffered embarrassment, humiliation, and mental distress as a result of the release. These allegations establish a foundation for a constitutional right-to-privacy claim. In sum, we reject the district court's alternative ground for dismissing the Blochs' privacy claim.

### IV. CONCLUSION

For all of the reasons set forth above, we have determined that the district court erred in dismissing the Blochs' retaliation claim

under Rule 12(b)(6). This is not to say that the Blochs will necessarily prevail at trial or that summary judgment will not be appropriate after discovery is completed. We are convinced, however, that the Blochs have the right to proceed to the next stage of the litigation. We therefore REVERSE the district court's dismissal of the Blochs' retaliation claim, AFFIRM its dismissal of their privacy claim, and REMAND the case for further proceedings consistent with this opinion.